***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Jones and the brief filed with the Full Commission. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award. Accordingly, the Full Commission affirms the Opinion and Award of Deputy Commissioner Jones.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing and in a Pre-Trial Agreement as:
 STIPULATIONS
1. The parties are bound by and subject to the North Carolina Workers' Compensation Act.
2. At all relevant times, an employment relationship existed between plaintiff and defendant-employer.
3. The Insurance Corporation of New York is the carrier on risk.
4. Plaintiff's average weekly wage was $300.00 yielding a compensation rate of $200.01.
5. Plaintiff suffered an injury by accident on May 6, 1997 to her big toe on her left foot.
6. Plaintiff last worked for defendant-employer and/or defendant-employer Successor Company on or about July 1, 1999.
7. Plaintiff's medical records were stipulated into evidence as Stipulated Exhibit 1.
8. Medical records from Charlotte Pain Associates were stipulated into evidence as Stipulated Exhibit 2.
9. The issues before the Full Commission are: (i) whether plaintiff is disabled under the North Carolina Workers' Compensation Act; (ii) if so, what compensation, if any is due the plaintiff; and (iii) whether sanctions are appropriate in this case.
 *********** EVIDENTIARY RULINGS
The objections raised in the deposition of N. Ranganathan, are OVERRULED.
 ***********
Based upon all the competent evidence of record and the reasonable inferences flowing therefrom, the Full Commission makes the following additional:
 FINDINGS OF FACT
1. On May 6, 1997, plaintiff suffered a compensable injury to the big toe on her left foot during the course and scope of her employment at Piedmont Heat Treating Corporation. At the time of her injury, plaintiff had been employed as a materials handler for three years. That position required plaintiff to lift orders weighing up to 50 pounds onto a metal cart and roll them to the shipping department. Plaintiff was injured when she stopped suddenly, causing the metal cart to run into her left foot. Plaintiff's average weekly wage at the time of the injury was $300.00, yielding a compensation rate of $200.01.
2. Plaintiff first sought treatment for her injury on May 7, 1997 from Dr. David Russell at Pro Med South. Dr. Russell restricted plaintiff to work performed in a sitting position and prescribed the use of a fracture shoe and Tylenol. Dr. Russell noted that plaintiff had pre-existing high blood pressure and diabetes and had been treated with medication for these conditions. He noted that she had stopped taking her medications and her glucose level had risen to be 492 and her blood pressure was elevated. Dr. Russell urged her to see her personal physician immediately. On May 16, 1997, Dr. Russell extended to plaintiff's restriction of duties until May 27, 1997.
3. Plaintiff presented to Dr. Michael Getter at Oweida Orthopaedic Associates, PA. on June 10, 1997. Dr. Getter noted her surgical history of bilateral bunion repairs as pertinent. Based on his physical exam, Dr. Getter suspected an EHL rupture, which he explained to plaintiff would not interfere with normal walking. Plaintiff next visited Dr. Getter on July 29, 1997. During this visit, Dr. Getter found the EHL tendon to be intact and began to suspect a stress fracture.
4. Thereafter, plaintiff was placed on total disability from August 1, 1997 until September 9, 1997 while she underwent diagnostic testing, including a three-phase bone scan of her ankles and feet at Charlotte Radiology on August 7, 1997. The results of the bone scan were consistent with an infarct or inflammation.
5. When plaintiff returned to Dr. Getter on August 13, 1997, her toe pain had improved. Dr. Getter opined that the bone scan results were not consistent with a fracture, but were consistent with an infarct, which would arise from her diabetes, or with inflammation, which could arise from her injury. Dr. Getter released her to sedentary work and prescribed medication for the inflammation.
6. On September 2, 1997, Dr. Getter found that plaintiff's foot continued to improve and he cleared her to return to work on September 9, 1997. Plaintiff actually returned to work on September 15, 1997. Plaintiff received temporary total disability benefits from August 1, 1997 through September 8, 1997.
7. On September 17, 1997, Dr. Getter noted that plaintiff's only problem was with squatting. He injected her with cortisone to alleviate the inflammation and released her for normal activities except squatting.
8. On October 8, 1997, Dr. Getter took more x-rays which revealed no bony abnormalities, but instead showed a misalignment of the lateral sesamoid related to her previous bunion surgery. He noted that plaintiff had never brought in the x-rays from Pro Med so he could compare the films. Dr. Getter also noted that plaintiff had returned to full work duties.
9. Plaintiff failed to keep her October 21, 1997 appointment with Dr. Getter and did not see him again until March 3, 1998. On that date, Dr. Getter found that her toe had a normal range of motion. He took new x-rays which showed that the alignment of her sesamoids had not changed. The abnormal alignment was a result of her previous bunion surgery. Dr. Getter gave her a Bard-Werner shoe to relieve her pain.
10. On April 7, 1998, Dr. Getter examined plaintiff for the last time and reviewed her tests and x-rays again. He found that her tenderness could be related to her previous bunion surgery and that there was "nothing to fix in her foot." Dr. Getter released her at maximum medical improvement and assigned her a partial permanent disability rating of zero.
11. Plaintiff sought a second opinion from Dr. Lowell Gill at the Miller Orthopaedic Clinic on June 17, 1998. During a series of five appointments from June 17 to August 31, 1998, Dr. Gill, Dr. Connor, and Dr. Giedraitis used physical exams, x-rays, a bone scan, an MRI, an EMG/NCV (nerve conduction study), and a CT scan to diagnose plaintiff's continuing foot pain. The results from each of these tests ruled out a series of suspected problems and finally led Dr. Gill to the conclusion that plaintiff suffered from diabetic neuropathy of the left foot which was unrelated to her work-place injury. On August 31, 1998, Dr Gill advised plaintiff that her symptoms were not related to her injury and that there was no disability resulting from her injury. Dr. Gill released plaintiff from care at that time.
12. Plaintiff scheduled another appointment with Dr. Gill on April 14, 1999, more than 7 months after her release from care, but later called to reschedule it to April 20, 1999. Plaintiff subsequently missed that appointment.
13. During the entire period between September 15, 1997, when plaintiff returned to work, and July 1, 1999, when her employment was terminated, plaintiff worked at full duty and earned her regular pay. During that time, Al Ellison, plaintiff's supervisor, found her work to be adequate.
14. On January 1, 1999, Piedmont Heat Treating instituted a new Attendance and Punctuality Policy. The purpose of the policy was to provide an equitable attendance program for all employees and to encourage regular attendance of employees in order to meet customer schedules. This policy established a system whereby employees were given attendance points for tardiness, early departure, absence, and failure to call before an absence. The policy further provided for progressive discipline and eventual termination of employees who accumulated too many points. Plaintiff acknowledged receipt of the new policy in a signed statement dated October 6, 1998. Each employee at the plant was required to sign a similar statement after a plant-wide meeting at which the human resources manager explained the new policy. By June 11, 1999, plaintiff had accumulated nine attendance points for documented instances of tardiness, absence, early departure from work, and late return from lunch. None of these instances occurred on dates when plaintiff obtained medical treatment for her injured toe. Plaintiff's nine points triggered the Counseling I requirement of the attendance policy. On June 11, 1999, N. Ranganathan, the general manager of Piedmont Heat Treating, warned plaintiff that he would soon conduct a Counseling session because of her accumulation of points.
15. N. Ranganathan conducted both Counseling I and Counseling II on June 21, 1999. By that time, plaintiff had accumulated a total of 10.5 points by being tardy on June 15 and absent on June 16.
16. In accordance with the attendance policy, plaintiff was suspended from work for three days. The suspension ran from June 22 through June 24, with plaintiff scheduled to return to work on June 25. Plaintiff signed the Attendance Counseling Notice dated June 21, 1999.
17. Plaintiff's only attendance point corresponding to a day on which she received medical care for her toe was June 16, 1999 when plaintiff presented to Dr. Ade Akande at Charlotte Pain Associates, PA based upon a referral from her attorney. At that time, Dr. Akande noted that plaintiff's numerous previous x-rays were not available to him. His plan of treatment required the records of plaintiff's previous treatment and diagnostic tests which were never produced.
18. Plaintiff returned to Dr. Akande on June 22, 1999. Dr. Akande noted that he had not received any records of her previous treatment from either Dr. Getter or Dr. Gill. Dr. Akande performed multiple trigger point injections of plaintiff's left foot. Dr. Akande's plan for plaintiff's treatment included obtaining a new MRI of her left foot.
19. Plaintiff was tardy to work again on July 1, 1999, bringing her attendance points to a cumulative total of 11. According to the Attendance and Punctuality Policy, an employee who accumulates eleven points in one year must be terminated from employment.
20. On July 1, 1999, N. Ranganathan conducted a Counseling III session and informed plaintiff that she was suspended immediately. Further, he informed plaintiff her employment could be terminated upon Linda Moser's review of the case. Plaintiff signed the Attendance Counseling Notice dated July 1, 1999.
21. Linda Moser, the vice-president of human resources, reviewed the case pursuant to standard company procedure. Following Linda Moser's review, plaintiff's employment was terminated.
22. At the time plaintiff's employment was terminated, she was performing her regular job of materials handler. She worked full time and she earned full wages. Plaintiff's employment was terminated pursuant to the Attendance and Punctuality Policy. Other employees were also terminated for violations of the Attendance and Punctuality Policy in 1999.
23. On July 7, 1999, Dr. Akande noted that plaintiff reported a 50-60% improvement in her pain. Dr. Akande performed another series of trigger point injections of plaintiff's left foot.
24. On July 13, 1999, Dr. Akande noted that plaintiff complained of new pain in the posterior aspect of her ankle that she had not reported over her previous two visits. Dr. Akande's treatment plan again called for a new MRI.
25. Dr. Akande next treated plaintiff on July 27, 1999, when he noted that plaintiff had not undergone the MRI as requested. Plaintiff was able to walk and stand on her left foot without pain. Dr. Akande reported that her chronic left foot and ankle pain was resolved. His plan called for a follow-up visit in two weeks before he released her from care.
26. Plaintiff presented to Dr. Akande for the last time on August 10, 1999. He noted that she had been able to walk without difficulty and had a new job driving a school bus. Plaintiff reported that her foot pain was only minimal and intermittent. Dr. Akande planned to continue plaintiff's "minimal medications" on an as necessary basis because plaintiff had shown "remarkable improvement." He determined that she had reached maximum medical benefit at that time. Dr. Akande did not assign plaintiff any permanent partial disability rating whatsoever.
27. Since August 10, 1999, the stipulated medical records reflect that plaintiff has not sought any ongoing medical treatment.
28. Plaintiff's termination was not related to her injury by accident.
29. There is insufficient evidence of record to determine by its greater weight that plaintiff has any disability since having been released at maximum medical improvement on April 7, 1998. Plaintiff has no permanent partial disability resulting from her injury by accident.
30. On January 26, 2000, Deputy Commissioner Jones had a telephone conference with Pamela A. Hunter and Anthony T. Lathrop concerning Tate
v. Moss Supply Company, IC No. 669208. In the course of that telephone conference, Deputy Commissioner Jones indicated that an Order would be issued that day placing plaintiffs counsel on notice that should she thereafter fail to comply with Pre-Trial Orders, discovery matters or other matters relating to the trial of workers' compensation cases before the Industrial Commission that sanctions and penalties would be imposed upon her. Such order was issued January 26, 2000.
31. In the present case, a Form 33 was filed by former plaintiff's counsel on May 3, 1999. On July 19, 1999, Pamela H. Hunter filed notice of appearance as plaintiff's counsel in this case. Defendants filed a Form 33R on July 30, 1999. Thereafter, defendants attempted to contact Ms. Hunter on numerous occasions concerning discovery requests. Defendants were either assured that discovery was forthcoming or requests were made from plaintiff's counsel to extend the time for complying with the discovery. Plaintiff's counsel failed to provide the discovery requested by defendants. Plaintiff's counsel also failed to provide medical releases or to assist defendants to obtain documentation.
32. After entry of the Order set forth in paragraph 30, plaintiff's counsel failed to comply with a Motion to Compel. Plaintiff's counsel failed to comply with the Pre-Trial Order. In spite of numerous efforts by the defense counsel, plaintiff's counsel failed to respond to those inquiries or to initiate a Pre-Trial Agreement or provide answers to discovery to defendant as ordered by the Commission.
33. On November 23, 1999, plaintiffs counsel was placed on notice that a Pre-Trial Agreement was to be filed with Deputy Commissioner Jones on January 17, 2000. To the date of Deputy Commissioner Jones' March 2 Order imposing sanctions on plaintiff's counsel, no Pre-Trial Agreement had been filed and defense counsel has indicated that plaintiff's counsel had not contacted them as required in the preparation of a Pre-Trial Agreement.
34. Plaintiff's counsel has had problems relating to many cases set before Deputy Commissioner Jones. Plaintiff's counsel has failed to comply with Pre-Trial Orders, discovery requests and other matters relating to the trial of cases before the Industrial Commission. This was the reason that Deputy Commissioner Jones entered the Order in Tatev. Moss Supply Company.
35. Plaintiff's counsel did not advise defense counsel prior to the date set for hearing of her intent to take a voluntary dismissal without prejudice when the case was called for hearing. Unaware that the case would not be tried on the hearing date, defendants prepared witnesses and were ready to proceed with the trial at the appointed time, resulting in unnecessary expense inasmuch as the process would have to be repeated in preparation for the continued hearing on March 14, 2000.
36. Plaintiff's counsel has failed to exercise good faith efforts to comply with the Rules of the North Carolina Industrial Commission and has failed to comply with Orders indicated in the Pre Trial Orders that accompanies calendar notices of the Industrial Commission.
37. As result of willful failure to comply with the Rules of the North Carolina Industrial Commission, plaintiff's counsel has caused needless expense to be incurred by the defendants. Sanctions are appropriate for plaintiff counsel's action. Defendants' counsel expended approximately $8,000.00 in needlessly preparing for trial on January 28, 2000. A reasonable sanction for this breach of the Rule would be $750.00 paid to defendants' counsel. Rule 613 of the Workers Compensation Rules of the North Carolina Industrial Commission; Bart Hawley v. Wayne DaleConstruction, No. COA00-976, filed October 2, 2001.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission reaches the following additional:
 CONCLUSIONS OF LAW
1. Plaintiff suffered an injury by accident to her left big toe on May 6, 1997. N.C. Gen. Stat. § 97-2(6).
2. Plaintiff received total disability compensation from August 1, 1997 until September 9, 1997. N.C. Gen. Stat. § 97-29.
3. Plaintiff was released to return to work at full duty having reached maximum medical improvement and receiving a zero (0) permanent partial disability rating on April 8, 1998. N.C. Gen. Stat. § 97-25; N.C. Gen. Stat. § 97-31.
4. Plaintiff returned to work at her pre-injury job and earned the same wages as before her injury. Plaintiff's period of disability ended upon her return to work. Dalton v. Anvil Knitwear, 119 N.C. App. 275,458 S.E.2d 251(1995), review denied, 341 N.C. 647, 462 S.E.2d 507(1995).
5. Plaintiff's claim, therefore, is not compensable under the provisions of the North Carolina Workers' Compensation Act. N.C. Gen. Stat. § 97-29; N.C. Gen. Stat. § 97-25.
6. Plaintiff's counsel failed to comply with the Rules of the North Carolina Industrial Commission in attempting to take a dismissal without prejudice without approval of the Industrial Commission in violation of Rule 613 (1) (a), and sanctions are appropriate against plaintiff's counsel under North Carolina Industrial Commission Rule 802, as follows:
 Upon failure to comply with any of the aforementioned rules, the Industrial Commission may subject the violator to any of the sanctions outlined in Rule 37 of the North Carolina Rules of Civil Procedure, including reasonable attorney fees to be taxed against the party or his counsel whose conduct necessitates the order.
Emphasis added.
7. Sanctions are appropriate for plaintiff's counsel's failure to comply with an Order compelling discovery in this case. North Carolina Industrial Commission Rule 605 (5), North Carolina Rules of Civil Procedure Rule 37. A reasonable sanction for this failure is $500.00 paid to the N.C. Industrial Commission by plaintiff's counsel.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 ORDER
1. Under the law, plaintiff's claim must be, and the same is hereby, DENIED.
2. Plaintiff's counsel shall pay $750.00 to defense counsel for her failure to comply with the Rules of the North Carolina Industrial Commission. North Carolina Industrial Commission Rules 613, 605 (5) and 802.
3. Plaintiff's counsel shall pay a $500.00 penalty to the North Carolina Industrial Commission for failure to comply with the Rules of the North Carolina Industrial Commission. North Carolina Industrial Commission Rule 802.
4. Each side shall bear its own costs, exclusive of the costs previously assessed against plaintiff's counsel.
This 19th day of February 2002.
 S/_____________________________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
S/_____________________________ RENEE RIGGSBEE COMMISSIONER
S/_____________________________ CHRIS SCOTT COMMISSIONER